# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs January 5, 2016

### STATE OF TENNESSEE v. WILLIE JONES

**Appeal from the Criminal Court for Shelby County**
**No. 12-05666    James M. Lammey, Jr., Judge**

---

### No. W2014-02428-CCA-R3-CD  -  Filed April 6, 2016

---

The defendant, Willie Jones, appeals his Shelby County Criminal Court jury convictions of second degree murder and being a felon in possession of a firearm, claiming that the trial court erred by admitting certain witness testimony and by excluding other witness testimony, by refusing to instruct the jury on self-defense, and by limiting his cross-examination of certain witnesses.  In addition, the defendant claims that the evidence was insufficient to support his conviction of second degree murder, that the trial court erred by imposing consecutive sentencing, and that the cumulative effect of these errors prevented him from receiving a fair trial.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Paul K. Guibao, Memphis, Tennessee (on appeal); and Lorna McClusky, Memphis, Tennessee (at trial), for the appellant, Willie Jones.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla Taylor and Chris West, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In October 2012, the Shelby County Criminal Court grand jury charged the defendant with one count each of second degree murder, employing a firearm during the commission of a dangerous felony, and being a felon in possession of a firearm, arising out of the shooting death of the defendant's wife, Melody Shawnee Jones.  The trial court conducted a jury trial in July 2014.

The State's proof at trial showed that on the evening of April 27, 2011, Memphis Police Department ("MPD") Officer David Rowsey was dispatched to 1309 Royal Oaks on a "shot fired" call. The defendant answered the door when Officer Rowsey and his partner, Officer Walker, arrived at approximately 11:00 p.m. The defendant stated that he had shot his wife and directed the officers to an upstairs bedroom, where Officer Rowsey discovered the body of the victim lying in a pool of blood. On cross-examination, Officer Rowsey clarified that the defendant had stated, "'You need to help me, I shot my wife by accident.'"

Derrick Delancy, a firefighter paramedic with the Memphis Fire Department, also responded to a call to the defendant's residence. Upon entering the residence, Mr. Delancy found the victim lying "in a big puddle of blood." While working to save her, Mr. Delancy noticed a handgun on the bed nearby and requested that MPD officers secure the firearm.

Lyrics Harlmon, the victim's brother, was awakened by multiple telephone calls between 10:30 p.m. and 10:46 p.m. on April 27. Mr. Harlmon then received a text message from his mother asking him to "call her ASAP." After speaking with his mother, Mr. Harlmon proceeded to the victim's residence. After he arrived, he listened to a voicemail left on his cellular telephone at 10:46 p.m., and he heard the voices of the defendant and the victim. After listening to the message, Mr. Harlmon gave the telephone to MPD officers on the scene. Through the testimony of Mr. Harlmon, the State entered into evidence a recording of the voicemail message, which was received from the defendant's telephone. On the recording, a man and a woman, identified by Mr. Harlmon as the defendant and the victim, can be heard arguing. Over the course of the four-minute recording, the arguing escalates as the defendant begins cursing at the victim and the victim tries to reason with him, asking, "Why are you doing this?" and "Why would you do that to your damn children?" The arguing stops and, after nearly 20 seconds of silence, the sound of a single gunshot is audible. A few seconds later, the defendant can be heard saying, in an even tone, "Shawnee," just before the recording ends.

On cross-examination, Mr. Harlmon insisted that he heard the victim state on the audio recording, "'[W]hy are you pointing the gun at me," and that he informed officers on the scene of the victim's mention of a gun. Mr. Harlmon also testified that he told officers that "it sounded like I may have heard a gun go off."

MPD Officer Lee Walker with the crime scene division photographed the crime scene on April 27, and through Officer Walker's testimony, the State introduced into evidence those photographs. Based on conversations with other officers on the scene, Officer Walker was under the impression that the defendant had been cleaning his

handgun when it fired, striking the victim.  Officer Walker searched for items that would typically be used to clean a firearm and found none.  Officer Walker photographed the handgun lying on the bed in the upstairs bedroom, then removed the ammunition from the weapon and catalogued both the ammunition and the firearm.

Tennessee Bureau of Investigation ("TBI") Special Agent and forensic scientist Cervinia Braswell testifed as an expert in firearms identification.  Agent Braswell examined the weapon recovered from the crime scene, a .22 caliber revolver, as well as one spent cartridge case and six live cartridges.  After test-firing four of the cartridges and examining the spent cartridge case from the crime scene, Agent Braswell determined that the cartridge case had been fired from the subject revolver.  Agent Braswell also examined the bullet recovered from the medical examiner, but the damage to the bullet was too extensive for her to determine whether it had been fired from the revolver.  Agent Braswell's examination of the victim's shirt revealed that the distance between the shirt and the muzzle of the revolver was less than 18 inches.

Marla Clark, the victim's cousin, testified that she paid the victim to transport her child to and from school.  One week prior to the victim's death, the victim told Ms. Clark that "she was tired of the situation and that she wanted a divorce and [the victim and the defendant] had agreed to . . . separate."  On the morning of April 27, Ms. Clark contacted the victim and asked if she was "ready for the gas money."  The victim responded in the affirmative, explaining that the money was needed because the only money she had at that time was needed to pay for car insurance.

MPD Sergeant Eric Jackson responded to a domestic violence call at the residence of the defendant and the victim on August 27, 2009.  When the victim placed the 9-1-1 call, she had explained that she "was involved with a physical altercation with" the defendant and that "she was calling in secret" because she did not want the defendant to know she had contacted the police.  When Sergeant Jackson arrived at the residence, he observed injuries to the victim's neck and arm.  Sergeant Jackson and his partner determined that the defendant was the primary aggressor and placed him under arrest.

A.H.J.,[1] the 12-year-old daughter of the defendant and victim, testified that, when she was five years old, she recalled that the victim was awake late at night waiting for the defendant to return home.  Because A.H.J. could not sleep, she sat with the victim in the living room.  When a truck arrived outside the residence, the victim instructed A.H.J. to return to her room.  A.H.J. overheard the victim tell the defendant to "tell that trick to come inside," followed by arguing among the victim, the defendant, and another woman.  After the woman left the house, A.H.J. heard her parents continue to argue, and

---

[1] As is the policy of the court, we refer to minors by their initials.

she heard "banging and loud noises against the wall" while her mother "would scream and cry."

When A.H.J. was six or seven years old and in the first grade, she was practicing baton twirling in her room when the defendant returned home "drunk" with "a brown bag with a bottle in it." The defendant took the baton from A.H.J. and began "bopping" A.H.J., the victim, and A.H.J.'s 17-year-old brother on the head with it. A.H.J., believing the defendant was just "playing," chased after the defendant to retrieve her baton. The victim asked the defendant to stop, stating that she knew he was "hitting [her] harder than" he was hitting the children. The defendant then stopped and punched the victim in the face.

When A.H.J. was in the second grade, she witnessed the defendant ask the victim for the family's gasoline discount card. The victim asked the defendant where he intended to go, and the defendant replied that it was none of the victim's business. When the victim refused to turn over the card, the defendant attempted to grab it from the victim's handbag, and the victim accused him of stealing. The defendant then began beating the victim repeatedly. A.H.J. attempted to call 9-1-1, but the defendant knocked the telephone from her hand and told her to go to her room. A.H.J. then tried to access 9-1-1 through a computer, but the defendant appeared and knocked the computer away from her while the victim "was just crying."

The following year, the victim decided to force the defendant to move out of the family's residence. A.H.J. encountered the defendant in the living room, packing his belongings, and A.H.J. asked the defendant to say a prayer with her. The defendant refused and told A.H.J. to "pray with [the victim] because she need[ed] it the most."

At the age of nine, A.H.J. moved to the Royal Oaks residence with her parents. Shortly thereafter, A.H.J. recalled an incident when she could hear "bumping against the wall and [the victim's] screaming and crying." Realizing that her parents were "fighting" again, A.H.J. attempted to call 9-1-1, but she did not know the address. The defendant's friend, known as Bologna, was visiting at the time, and A.H.J. asked him to "go outside and tell me the address." When Bologna realized that A.H.J. was contacting the authorities, he took the telephone from her and ended the call.

Approximately one week before the victim's death, A.H.J. overheard her parents arguing in their bedroom. A.H.J. heard the defendant tell the victim that "'one day you ain't going to be here.'"

Doctor Karen Chancellor, forensic pathologist and chief medical examiner for Shelby County, performed the victim's autopsy. Doctor Chancellor determined that

the cause of the victim's death was a gunshot wound to the chest, and the manner of death was homicide.

With this evidence, the State rested. Following a *Momon* colloquy and the denial of the defendant's motion for judgments of acquittal, the defendant elected to testify and to present proof.

Officer Kevin Covington with the MPD Felony Response Bureau testified that he took a statement from Mr. Harlmon on April 27 and that he did not recall Mr. Harlmon's stating anything about a gun or a gunshot.

The defendant testified that he and the victim had been in a relationship for 20 years at the time of her death. He admitted that they "argued a lot" and "fought a lot" and that they would occasionally "break up for a while." The defendant denied ever bringing another woman to the residence he shared with the victim, and he did not recall the incident with the baton. When asked if he had ever struck the victim, the defendant responded that he and the victim "had a lot of physical altercations." With respect to A.H.J.'s testimony about the gasoline discount card incident, the defendant admitted to pushing the victim, causing her to fall over a recliner, but he denied beating her. The defendant denied ever "smack[ing] a computer out of" A.H.J.'s hands and insisted that he had never been abusive to his children. The defendant also denied ever telling the victim, "'[Y]ou're not going to be around.'"

When asked about the voicemail recording that had been entered into evidence, the defendant explained that he had been angry at his brother for erasing the telephone numbers that had been saved in his cellular telephone. The defendant stated that the victim was asking him "why I'm acting like that, it ain't her fault." The defendant testified that he and the victim then began arguing about money because the victim "didn't want to tell [him] how much money she had." The victim told the defendant "she was fixing to count her coins," and, according to the defendant, the argument ceased. The victim was cleaning up the bedroom while the defendant drank a beer.

When he finished his beer, the defendant asked the victim for his gun. The victim told him that the gun was inside her purse. The defendant testified that he retrieved the gun and that it was "already cocked from the night before." He explained that he routinely slept with the firearm cocked in order to protect the house from an intruder. The defendant stepped into the bathroom to wash his hands and told the victim that he planned to go outside to shoot his gun. As the defendant was standing in the doorway of the bathroom, he attempted to uncock his weapon. Because his hands were still wet, his thumb "slipped off the hammer" and the gun "fired," striking the victim.

The victim called the defendant's name, and he "could tell by the panic in her voice that something was wrong." The defendant then threw the gun onto the bed and contacted 9-1-1. The 9-1-1 recording, which was admitted into evidence and played for the jury, indicated that the call was placed by the defendant at 10:50:31 p.m. The defendant denied that he had intended to shoot or kill the victim.

The defendant admitted that he was a convicted felon and that, as such, he should not have had a handgun in his possession.

Based on this evidence, the jury convicted the defendant as charged of second degree murder and being a felon in possession of a handgun; the State agreed to enter a judgment of nolle prosequi on the charge of employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court imposed a 25-year sentence for the second degree murder conviction, to be served at 100 percent by operation of law. The court sentenced the defendant as a multiple offender for the felon in possession of a firearm conviction and imposed a four-year sentence, to be served consecutively to the 25-year sentence, for an effective sentence of 29 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by admitting certain witness testimony and by excluding other witness testimony, by refusing to instruct the jury on self-defense, and by limiting his cross-examination of certain witnesses; that the evidence adduced at trial was insufficient to support his conviction of second degree murder; that the trial court erred by imposing consecutive sentencing; and that the cumulative effect of these errors prevented him from receiving a fair trial. We will address each issue in turn.

*I. Evidentiary Issues*

*A. Prior Bad Acts*

The defendant first contends that the trial court improperly admitted evidence of his prior bad acts and that the trial court erred by excluding testimony of the victim's violent nature. The State responds that the trial court did not abuse its discretion.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the

trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

In the instant case, the trial court conducted hearings outside the jury's presence to determine the admissibility of the testimony of Officer Jackson regarding the defendant's August 2009 arrest for the domestic assault of the victim; the testimony of Ms. Clark concerning the victim's intent to file for divorce and her need of gasoline money; and the testimony of A.H.J. regarding the defendant's prior domestic abuse of the victim. With respect to Officer Jackson, the court found clear and convincing evidence of a settled purpose to harm the victim, *see State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993), that it was not too far removed in time from the murder to be relevant, and that its probative value was not outweighed by the danger of unfair prejudice. No abuse of discretion attends the admission of this testimony.

Concerning the testimony of Ms. Clark, it appears that her testimony did not rise to the level of a 404(b) issue. That the victim indicated, one week prior to her death, that she wished to divorce the defendant and stated on the date of her death that she was in need of gasoline money does not call into question the defendant's character or action in conformity with a character trait. Both of the victim's statements were unquestionably hearsay, *see* Tenn. R. Evid. 801, 802, but the statement regarding the divorce was subject to the state of mind exception, *see* Tenn. R. Evid. 803(3). The statement concerning the need for gasoline money appears to be inadmissible hearsay subject to no exception. The defendant failed to object to this testimony at trial, however, and a court "generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). In any event, the testimony regarding the victim's need for gasoline money was certainly harmless.

With respect to A.H.J.'s testimony of multiple instances of domestic abuse and threats, the trial court found clear and convincing evidence of the defendant's settled purpose to harm the victim and the volatile relationship between the defendant and the victim, *see Smith*, 868 S.W.2d at 574, and the court further found that the probative value of each of the six specific incidents outweighed the danger of unfair prejudice. Additionally, the trial court found A.H.J. to be "very impressive" and found her testimony to be "very, very believable."

Given the trial court's thorough compliance with the requirements of Rule 404(b), we find no abuse of discretion in the lower court's decision to admit the aforementioned testimony.

## B. Self-Defense

The defendant argues that the trial court erred by refusing to allow the defendant's mother to testify about the victim's violent nature and by refusing to instruct the jury on self-defense.

Our review of the record reveals that at no point did the defendant request a jury instruction on self-defense, nor did the defendant raise this issue in his motion for new trial or his amendments to the motion. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). "Issues raised for the first time on appeal are considered waived." *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996); *see also* Tenn. R. App. P. 36(b). Because he raises the jury instruction issue for the first time on appeal, it is waived.

With respect to the defendant's argument that the trial court erred by its refusal to allow him to present the testimony of his mother regarding the victim's alleged violent nature, the defendant failed to make an offer of proof following the trial court's ruling. Without this testimony, we cannot assess the impact of the trial court's exclusion of the evidence. When the trial court makes a ruling excluding evidence, the party offering the evidence is obliged to make an offer of proof to preserve the issue for review. *See* Tenn. R. Evid. 103(a)(2) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."); *see also State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."). Accordingly, the defendant has waived this issue.

## II. Cross-Examination of State Witnesses

The defendant next contends that the trial court erred by limiting his ability to meaningfully cross-examine A.H.J. and Mr. Harlmon, thereby infringing on his

constitutional right to confront witnesses against him. We disagree.

In Tennessee, "the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993); *see State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994); *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). Consequently, absent a clear abuse of discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

With respect to the testimony of A.H.J., the defendant wished to cross-examine her regarding her alleged anger issues and an unidentified medication she had been prescribed for, among other things, post-traumatic stress disorder. The trial court conducted a hearing outside the presence of the jury and determined that questions regarding A.H.J.'s alleged anger and prescribed medication were irrelevant. Given the overwhelming evidence of the defendant's guilt, as will be addressed more fully herein, we cannot say that this limitation imposed by the trial court resulted in "manifest prejudice" to the defendant, and we find no abuse of discretion in the trial court's decision.

Likewise, we find no abuse of discretion in the trial court's supposed limitation of the cross-examination of Mr. Harlmon. The defendant complains that Mr. Harlmon testified on direct examination that he had informed MPD officers that he had heard the sound of a gunshot on the voicemail left by the defendant at 10:46 p.m. on April 27 but that Mr. Harlmon's statement to officers at the scene contained no such mention of hearing gunfire. On cross-examination, Mr. Harlmon insisted that he had told officers about the sound of the gunshot, but defense counsel failed to impeach Mr. Harlmon with his statement. When defense counsel attempted the impeachment on recross-examination, the State objected, and the trial court sustained the objection, properly finding that such questioning was beyond the scope of redirect examination. Moreover, in the defendant's case-in-chief, MPD Officer Kevin Covington testified that he took a statement from Mr. Harlmon on April 27 and that he did not recall Mr. Harlmon's stating anything about a gun or a gunshot. Under these circumstances, nothing indicates that the trial court improperly restricted the defendant's ability to effectively cross-examine Mr. Harlmon. The defendant is not entitled to relief on this issue.

*III. Sufficiency*

Next, the defendant argues that the evidence adduced at trial was insufficient to support his second degree murder conviction. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence strongly supports the defendant's conviction of second degree murder. The evidence established that the defendant shot the victim once in the chest from a distance of less than 18 inches. On the audio recording of the four-minute voicemail left on Mr. Harlmon's telephone at 10:46 p.m. on April 27, the defendant and the victim can clearly be heard arguing, and the argument escalated into the defendant's raising his voice and cursing at the victim. Near the end of the four-minute recording, the sound of a gunshot is audible, and a few seconds later, the defendant calmly says the victim's name before calling 9-1-1 at 10:50:31 p.m. Although the defendant claimed that the shooting was accidental, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

*IV. Sentencing*

The defendant next contends that the trial court abused its discretion by ordering consecutive service of his sentences. Specifically, the defendant asserts that the trial court failed to make the requisite findings to classify him as a dangerous offender. Again, we disagree.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

With respect to consecutive sentencing, our supreme court has held that the standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). When the trial court bases its consecutive sentencing determination on the "dangerous offender" ground, the court "must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Id.* at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)).

At the sentencing hearing in the instant case, the trial court clearly determined that consecutive sentencing reasonably related to the severity of the defendant's crimes but failed to make the other requisite finding of necessity to protect the public from further criminal acts. When "[f]aced with this situation, the appellate court has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences."

*Pollard*, 432 S.W.3d at 864. In this case, unlike the situation in *Pollard*, sufficient factual findings exist for this court to conduct a de novo review.

The defendant's presentence report, which was introduced into evidence at the sentencing hearing, established that his criminal history spanned some 13 years, beginning with minor traffic convictions at the age of 19 and graduating to two felony drug convictions, a conviction of criminal exposure to HIV, and a conviction for the prior domestic assault of the victim. The trial testimony established that the defendant had repeatedly engaged in the domestic abuse of the victim, even going so far as to threaten her impending demise one week prior to her murder.

Given the defendant's lengthy criminal history, his history of domestic violence against the victim, and his possession of a loaded and cocked handgun, the sentence imposed by the trial court reasonably related to the severity of the crimes committed and was necessary to protect the public from further criminal acts by the defendant. As such, the proof established that the defendant was a dangerous offender. We therefore find an adequate basis for the imposition of consecutive sentencing and affirm the sentencing determination of the trial court.

## V. Cumulative Error

Finally, the defendant contends that the cumulative effect of the trial court's errors inured to his prejudice. Having considered each of the defendant's issues on appeal and concluded that he is not entitled to relief for any, we need not consider this issue any further. *State v. Hester,* 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## Conclusion

Based upon the foregoing analysis, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE